**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| A.C. and A.B., *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>JACKSONVILLE ORTHOPAEDIC INSTITUTE, INC.,<br><br>Defendant. | Case No. ____________<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs A.C. and A.B., at all times relevant herein, have been patients of JACKSONVILLE ORTHOPAEDIC INSTITUTE, INC. ("JOI" or "Defendant"), a medical facility providing orthopedic care in the North Florida community. Plaintiffs bring this class action lawsuit in their individual capacity and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, upon their counsels' investigation, and upon information and belief as to all other matters, as follows:

1. Plaintiffs bring this case to address Defendant's unlawful practice of collecting, disclosing, and monetizing Plaintiffs' and Class Members' confidential personally identifiable information ("PII"), confidential health communications

("CMC"), and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including Google, Inc. ("Google") and Meta Platforms, Inc. ("Facebook" or "Meta") without consent, through the use of tracking software that was implemented, configured, and embedded in Defendant's website.

2. Defendant is a leading orthopedic practice in the Jacksonville, Florida region that provides comprehensive orthopedic and physical rehabilitation care and operates the website www.joionline.net (the "Website" or "Defendant's Website"). Defendant holds its Website out to the public, including Plaintiffs and Class Members, as a method of marketing its healthcare services and offering its patients access to a variety of online services.

3. Defendant is a HIPAA-covered healthcare entity, and thus its disclosure and use of Private Medical Information for marketing is tightly regulated. The United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

4. Defendant encourages its patients, including Plaintiffs and Class Members, to utilize the Website as a confidential means of searching for medical

services, scheduling medical appointments with Defendant, completing registration forms, paying bills, and accessing online medical records.

5. Plaintiffs and Class Members had a reasonable expectation of privacy when utilizing the Website for healthcare services including when searching for specific health conditions, searching for specific physicians, scheduling medical appointments, completing registration forms, paying bills, and accessing the online Modernizing Medicine portal.

6. Defendant owed its patients, including Plaintiffs and Class Members, multiple legal duties to protect the Private Information it collected and stored through its Website. These duties included common law, contractual, and statutory duties to protect against the disclosure and misuse of Plaintiffs' confidential health and medical communications.

7. Although Plaintiffs are presently unaware of every type of pixel and tracking tool that Defendant deployed during the relevant time period, "Tracking Tools" refers to any technology that divulges confidential information to an unauthorized third-party: (1) that has not executed a HIPAA-compliant business associate agreement with Defendant; and (2) for which patients did not execute a HIPAA-compliant marketing authorization.

8. As used herein, the term "Tracking Tools" includes (1) Google Analytics, the Google Tag Manager, similar tools offered by Google in conjunction with its

marketing products and other platforms (such as "DoubleClick" and "YouTube"); and (2) Facebook or Meta's Pixel and other "Business Tools" it provides to marketers.

9. The Tracking Tools' specific purpose is to provide website owners with the ability to acquire the raw web user data and to then transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. The Tracking Tools are offered for "free" to companies like Defendant but require the website owner to share and disclose web users' valuable behavioral web browsing data with the Unauthorized Third-Party Marketer.

10. Google makes a profit by capturing and sharing web user data. Google's online advertising business generated 42.4 percent of global digital ad revenue in 2023.[1]

11. With the intent to monetize the patient information flowing through its Website, Defendant installed Tracking Tools from the Unauthorized Third-Party Marketers onto its Website, which provided Defendant with valuable marketing tools to create more efficient and profitable marketing campaigns.

12. In implementing the Tracking Tools, Defendant deprived Plaintiffs and Class Members of their privacy and property rights by: (1) surreptitiously tracking, recording, and aggregating Plaintiffs' and Class Members' confidential communications and Private Information; (2) causing Plaintiffs' and Class Members'

---

[1] *Global Digital Advertising Revenues – A Look at the Big Three*, VISIBLE ALPHA (May 17, 2023), https://visiblealpha.com/blog/global-digital-advertising-revenues-a-look-at-the-big-three-alphabet-googl-meta-platforms-meta-amazon-com-amzn/ (last visited August 10, 2026).

communications to be disclosed and intercepted by Unauthorized Third-Party Marketers; (3) utilizing the Private Information for marketing purposes; and (4) converting and monetizing the Private Information through various marketing tactics, which, upon information and belief, included audience building, retargeting, geo-location, and other invasive marketing tactics. At no point in the data monetization process did Defendant obtain proper express written consent from Plaintiffs or Class Members for any of these tortious acts.

13. Indeed, by deploying a combination of Facebook and Google tracking tools, Defendant maximized the exposure of its patients' and prospective patients' Private Information to the valuable advertising ecosystems in order to gain the highest probability of converting new patients with the lowest cost per conversion of a new patient.

14. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, PHI is defined as individually identifiable health information ("IIHI") that relates to a person's past, present, or future physical or mental health, the delivery of healthcare services, or payment of health care. Data is identifiable under HIPAA if it directly identifies the individual or if there is a reasonable basis it could be used to identify the individual.[2]

---

[2] 45 C.F.R. § 160.103.

15. A covered entity, like Defendant, cannot disclose a person's PHI to a third party or utilize a person's PHI for marketing purposes without express written authorization.

16. Plaintiffs' and Class Members' browsing and behavioral Website data qualifies as PHI because the data (1) related to the past, present and future medical care of the patient and (2) was sent in combination with direct and indirect identifiers from which the Plaintiffs and Class Members could be reasonably associated with the data.

17. At a minimum, the information that JOI divulged to the Unauthorized Third-Party Marketers allowed the marketers to learn that specific individuals were patients seeking or receiving treatment, at JOI physician offices, rehabilitation facilities, and other related medical centers. In and of itself, this type of data reveals the fact that an individual is being treated for orthopaedic-related medical conditions.

18. Specifically, the Tracking Technology collected and disclosed to Google contained Plaintiffs' and Class Members' confidential communications in the form of the descriptive page URLs and user identifiers from the pages Plaintiffs and Class Members searched and viewed, such as: (a) the Contact Us page, (b) the pages listing services, (c) the pages listing conditions, (d) the pages listing locations, and (e) the pages listing doctors; as well as the most sensitive parts of the Website, such as: (f) Patient Info pages, (g) Online Bill Pay page, and (h) the Book an Appointment page. The Tracking Technology also collected and disclosed specific actions taken by the

Plaintiffs and Class Members (i.e., events) on those pages. The events include clicks, views, and entering information on forms on the log-in page. (Collectively, private search/page view data and private page click data will be referred to as "Private Browsing Information").

19. In combination with the disclosure of the Private Browsing Information, the Tracking Tools collected and disclosed unique personal identifiers, including: tracking IDs, timestamps, Google IDs, Meta IDs, device IDs, and various data used for browser fingerprinting. While appearing anonymous, the unique identifiers are unique data points from which Google and Meta can either directly identify with their records or easily cross-reference with other expansive data sets to connect and identify the Plaintiffs and Class Members with the specific Private Browsing Information.[3]

20. Google, for example, can easily connect patient data from Defendant's Website to an individual patient's Google Account ("cid"), which is linked to the users' Google account and contains additional details about their identity. Google "stores users' logged-in identifier on non-Google websites … in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-

---

[3] Defendant's Meta Pixel has its own unique identifier (represented as id=1760345740860348), which can be used to identify which of Defendant's webpages contain the Meta Pixel. Separately, "Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20stores%20a%20client,is%20disabled%20through%20Consent%20Mode (last visited June 30, 2026).

private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[4]

21. Simply put, the health information disclosed through the Tracking Tools is personally identifiable health information and is the digital equivalent of disclosing a comprehensive patient list to Google or Meta. Indeed, the Unauthorized Third-Party Marketers each offer Tracking Tools free of charge, but the price that Defendant paid was the intercepted patient data. Effectively, Defendant traded its patient list for access to the "free" marketing tools.

22. The HIPAA Safe Harbor rule allows for a limited data set[5] of PHI to be disclosed, provided that (1) specific direct identifiers are removed from the data set and (2) the recipient enters into a Business Associate Agreement ("BAA") promising certain safeguards. Here, the identifiers were not removed, and there was no BAA signed—so the Safe Harbor would not apply. Moreover, it is well recognized that

---

[4] *See Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. Aug. 7, 2023) (denying summary judgment and citing internal evidence from Google employees).

[5] 45 C.F.R. § 164.514(e). A limited data set is protected health information that excludes the following direct identifiers of the individual or of relatives, employers, or household members of the individual: (i) Names; (ii) Postal address information, other than town or city, State and zip code; (iii) Telephone numbers; (iv) Fax numbers; (v) Electronic mail addresses: (vi) Social security numbers; (vii) Medical record numbers; (viii) Health plan beneficiary numbers; (ix)Account numbers; (x) Certificate/license numbers; (xi) Vehicle identifiers and serial numbers, including license plate numbers; (xii) Device identifiers and serial numbers; (xiii) Web Universal Resource Locators (URLs); (xiv) Internet Protocol (IP) address numbers; (xv) Biometric identifiers, including finger and voice prints; (xvi) Full face photographic images and any comparable images. 45 C.F.R. § 164.514(e)(2).

Google and Facebook will not execute BAAs with healthcare providers related to the transmission of data from health services websites.

23. To be sure, there are many analytics companies and marketing campaigns that are HIPAA compliant that would have prevented Defendant's tortious acts; but Defendant opted for known non-HIPAA compliant analytics and marketing tactics to take advantage of the free services and gain access to powerful analytics, audience building, and re-targeting tools.

24. Indeed, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online Tracking Tools. The Bulletin expressly provides (in bold type) that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**" In other words, HHS has expressly stated that JOI's implementation of Tracking Tools violated HIPAA Rules.

25. The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

26. In addition, state and federal wiretapping laws expressly forbid Defendant's conduct. Specifically, the Florida Security of Communications Act ("FSCA"), Florida Statutes § 934.01, *et seq.*, and the Florida Constitution protect the private communications of innocent persons. Moreover, the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq*, prohibits the unauthorized interception of patrons' confidential communications with medical providers like Defendant.

27. Although Defendant's actions described below in detail violated several state and federal states, Defendant has taken no action to modify its conduct following the release of numerous class action settlements around the country.

28. Despite its duties, representation, and warnings, and without any form of consent from Plaintiffs or Class Members, Defendant implemented and configured a variety of surreptitious tracking technologies on the Website with the intent to collect and analyze its patients and prospective patients' online behavioral data to enhance and profit from its digital marketing programs.

29. The Tracking Tools are typically used to collect and then analyze web users' behavioral data in order to then identify, target, and market products and services to specific audiences built with the assistance of Facebook and Google algorithms and computing.

30. Upon information and belief, Defendant utilized the Tracking Tools to monetize its patients' and prospective patients' data, including Plaintiffs and Class

Members, but collecting the data, analyzing the data, and then targeting its patients and prospective patients with marketing campaigns intended to drive more users to the website and convert more scheduled medical services. The marketing tactics likely included creating tracking parameters, customizing and optimizing its website, building custom audiences, and launching digital campaigns.

31. Before Defendant could disclose the Private Information or use it for marketing purposes, Defendant was required to obtain express written consent from each patient and prospective patient.

32. Defendant, however, acted secretly and did not disclose the presence of these Tracking Tools to Plaintiffs or Class Members. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Meta or Google or allowing Defendant to use their PHI for marketing purposes.

33. Consequently, Defendant breached its common law, contractual, and statutory duties by: (1) implementing and configuring the Tracking Tools that secretly recorded and surveilled Plaintiffs' and Class Members' Private Medical Communications with Defendant; (2) disclosing Plaintiffs' and Class Members' Private Information to Google and Facebook without express written consent by each patient; (3) disclosing Plaintiffs' and Class Members' Private Medical Information to Google without Business Associate Agreement(s); and (4) using Plaintiffs' and Class

Members' PHI for marketing purposes without express written consent from each patient.

34. In sum, through the use of Tracking Tools, Defendant intentionally transmitted Plaintiffs' and Class Members' highly sensitive communications and Private Information to Unauthorized Third-Party Marketers, including communications that contained private and confidential health information. Further, Defendant utilized marketing tools and tactics with the intent of monetizing the Plaintiffs' and Class Members' highly sensitive communications and Private Information. Neither Plaintiffs nor any Class Member signed a written authorization permitting Defendant to disclose or use their Private Information for marketing purposes.

35. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous harms and injuries, including the invasion of their privacy, breach of the fiduciary duties owed to them, breach of the confidentiality owed to them, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

36. Consequently, Plaintiffs individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiffs and the putative Class

have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal damages. Plaintiffs further seek restitution and disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to address the ongoing violations of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

37. Plaintiffs seek to remedy these harms and brings causes of action for (1) violation of the Florida Security of Communications Act, § 934.01, *et seq.*, Fla. Stat. ("FSCA"); (2) invasion of privacy; (3) breach of implied contract; (4) unjust enrichment; (5) violations of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1), and (6) breach of confidence.

**PARTIES**

38. Plaintiff A.C. is a natural person and citizen of Jacksonville, Florida where she intends to remain.

39. Plaintiff A.C. provided her Private Information to JOI as a patient seeking medical care, and she used its Website to communicate that information, on the condition that it would be kept confidential and not disclosed to any unauthorized third parties.

40. Plaintiff A.B. is a natural person and a resident and citizen of Jacksonville, Florida, where he intends to remain.

41. Plaintiff A.B. provided his Private Information to JOI as a patient seeking medical care, and he used its Website to communicate that information, on the condition that it would be kept confidential and not disclosed to any unauthorized third parties.

42. Defendant Jacksonville Orthopaedic Institute, Inc. is a healthcare provider that serves northern Florida, with its principal place of business located at 1325 San Marco Blvd., Suite #200, Jacksonville, Florida.[6]

43. Founded in 1994, JOI operates 3 physician's offices providing orthopedic services to patients in northern Florida and Southern Georgia, as well as 6 rehab/physical therapy locations in San Marco, Beaches, Amelia Island, Nocatee, Arlington, and Mandarin, Florida.[7]

44. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Parts 160, 162, and 164 (HIPAA)).

**JURISDICTION & VENUE**

45. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs,

---

[6] https://www.joionline.net/ (last visited August 10, 2026).

[7] https://www.joionline.net/about-us/ (last visited June 8, 2026)

there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

46. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*, and 18 U.S.C. § 2702).

47. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

48. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District and a substantial portion of the acts and omissions giving rise to the Plaintiffs' claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Duty of Confidentiality

49. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

50. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

51. The AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including, … personal data (informational privacy) . . . .[8]

[8] https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care (last visited Aug.

52. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of a patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. ***Disclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship***. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified.[][and] ; (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about) the purpose(s) for which access would be granted.[9]

53. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. ***Physicians who collect or store patient information electronically … must: … [r]elease patient information only in keeping with ethics guidance for confidentiality and privacy.[10]***

**B. Expectation of Privacy**

54. At all times when Plaintiffs and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the

11, 2026).

[9] https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies (last visited Aug. 11, 2026).

[10] https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records (last visited Aug. 11, 2026).

information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

55. Plaintiffs and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

56. A patient's web activity and Private Information includes page views of medical information, page views of specific physicians, form completions requesting a medical appointment, clicks on log in buttons for access to a patient portal, and form completions paying a medical bill, all of which relate to the past, present, and future medical care of that individual. Moreover, that web activity when combined with unique identifiers that can connect the web activity with a specific person is PHI under HIPAA.

57. Defendant deprived Plaintiffs and Class Members of their privacy rights when it intentionally, and/or recklessly, and/or negligently: (1) implemented and configured several Tracking Tools on its Website that surreptitiously tracked, surveilled, and recorded Plaintiffs' and Class Members' PHI; (2) disclosed Plaintiffs' and other Class Members' PHI to unauthorized third parties (i.e., Google and Facebook); (3) utilized Plaintiffs' and Class Members' PHI for marketing purposes; and (4) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

58. By installing and implementing both Facebook and Google Tracking Technology, Defendant intentionally and proximately caused Plaintiffs' and Class Members' PHI to be intercepted by and/or disclosed to Facebook and Google.

C. **Underlying Web Technology Tracking Tools & Communications**

59. To understand Defendant's unlawful data-sharing and data misuse practices, it is important to understand the basics of computer science and online communications.

60. Devices (such as computers, tablets, or smart phones) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

61. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

62. Every website is comprised of markup and source code. Markup is the forward facing portion of the website that the visitor sees and interacts with, such as images, links, forms, and more. By contrast, source code is essentially the invisible back-end portion of the website. The website user does not see what is happening within the source code during an ordinary website visit, but the source code acts as the set of instructions that commands the website visitor's browser and causes it to take certain actions when the web page first loads or when a specified event triggers the

code. The source code is the mechanism that controls how a website user's browser communicates with the website's server, and vice versa.

63. As a user interacts with a website, multiple forms of web communications are occurring in the background between the user's browser and the website's server and include, but are not limited to:

- **HTTP Requests** are electronic communications sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests (e.g., request to access a page). POST Requests are requests to send data to the server (e.g., Form Submissions);

- **HTTP Responses** are electronic communications sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data;[11]

- **Uniform Resource Locators ("URL")** are web addresses that contain details of the HTTP Request and the user's specific search and browsing activities;

- **Cookies** are small text files that are set by the website the user is visiting and establish lines of communication between the user's browser and the website server. First Party Cookies are used to store information on the client device which can later be communicated to a server or servers such as user preferences (e.g., remember log in info). Users cannot detect or prevent transmissions through first-party cookies. Third-Party Cookies are set by a third-party domain such as Google and are used for targeted marketing purposes. Third-Party cookies can track the user across the web as the user searches and visits other websites.

64. A website owner, if motivated, can manipulate the HTTP Request process and allow third parties access to the user-server web communication. This

[11] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

interference is typically done through Tracking Technology with the intent to gather data from the user's website behavior for monetization and various marketing purposes.

65. Tracking Technology is implemented on a website by secretly embedding and configuring the tracking software into the Source Code. Once the Tracking Technology is implemented and configured in the Source Code, the Tracking Technology automatically intervenes and manipulates the HTTP web communication between the user's browser and the website server and instructs the website to send a duplicate transmission of the communication to unauthorized third-party servers, i.e., Google.

66. Here, without its patients' consent, Defendant effectively used its Source Code to commandeer and "bug" or "tap" its patients' computing devices, allowing Google, Meta, and other third parties, to listen in on all of their communications with Defendant and thereby intercept those communications, including PHI.

### D. Defendant Collected & Disclosed Plaintiffs' and Class Members' Private Information to Facebook Through the Use of the Meta Pixel.

67. Defendant implemented and configured at least one Meta Pixel in its Website Source Code with the intent to: (a) intervene and manipulate Plaintiffs' and Class Members' HTTP request communications; and (b) to collect and share Plaintiffs' and Class Members' behavioral data with Meta.

68. Defendant and Facebook collected vast amounts of Private Information about Plaintiffs and the Class Members through the Meta Pixel.

69. The Meta Pixel is a small (often invisible) piece of code that can be placed in the source code of a website, emails, or digital ads for data collection purposes. The Meta Pixel is a specific type of tracking pixel that connects a web user's browsing activity directly to the Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager. The primary purpose of the Meta Pixel is to force a connection between the user's device and Meta's server, so that the Defendant can monitor, surveil, and collect user activity on its Website for marketing purposes.

70. Meta offers Tracking Tools to entities like Defendant as "free" software that advertisers can easily integrate into their webpages, mobile applications, and servers thereby enabling the almost seamless implementation and configurations of pixels into the Source Code. In fact, however, access to the Meta tools is bartered in exchange for Defendant's patients' PHI.

71. By installing and implementing the Meta Pixel, Defendant caused Plaintiffs' and Class Members' communications to be intercepted by and/or disclosed to Meta. As described above, once the Meta Pixel code is implemented in the Website source code, the pixel automatically intervenes with the web-user's browser and causes an unauthorized HTTPS Request and Response command to the user's browser, forcing the user's browser to send Meta information about the user's visit on the Website and the user's identity.

72. The baseline configuration collected standard events including page views, links clicked, forms completed and submitted, timestamps of when the event occurred, and referrer data (showing which page led the user to the current one). Additional custom event tracking can be added by configuring additional code.

73. When Plaintiffs and Class Members visited the Website, they would only see the Markup. Behind the scenes, however, the Meta Pixel software was embedded in the Source Code and was automatically transmitting what the patient did on the webpage and effectively opening a hidden spying window for Meta into the patients' browsing behavior.

74. As a direct result of implementation and configuration of the Meta Pixel, Defendant disclosed PHI to Meta in the forms of page views, button click tracking, form download tracking, and conversion tracking that related to the past, present, and future medical care of Plaintiffs and Class Members. Without discovery, Plaintiffs are unable to know precisely the configuration utilized by Meta.

75. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, and events each (1) related to the past, present, and future medical care of Plaintiffs and Class Members, (2) conferred and indicated that the user (Plaintiffs and Class Members) was a patient or prospective patient at the time of the tracked web activity, and (3), as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

76. Moreover, each of these web communications were disclosed without Plaintiffs' or Class Members' express written consent and without a business associates agreement(s) between Defendant and Meta.

77. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, downloads, and conversions each (1) related to the past, present and future medical care of Plaintiffs and Class Members, (2) confirmed and indicated that the user (Plaintiffs and Class Members) was a patient or prospective patient at the time of the tracked web activity, and (3), as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

**E. Plaintiffs' and Class Members' Health Data were Reasonably Identifiable Through Meta Identifiers.**

78. With each web communication between Plaintiffs and Class Members and the Website's server, persistent user identifiers were disclosed to Meta. These various identifiers would allow Meta to connect the specific patient with the activity as well as enable cross-platform tracking and audience creation based on the health care seeking behavioral data.

79. Meta used several digital identifiers: When the website user is logged into Facebook on their web browser or device, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's "c_user" cookie, which contains that user's unencrypted Facebook

ID and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

80. A user's Facebok profile generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

81. The Meta Pixel also works in combination with persistent identifiers and fb_cookies (FID) or c_user cookies to connect the specific behavioral data on the Website to individuals, where it can be further used to build user profiles and enable cross-device tracking to surveil and collect data from individuals as they search and review other website content. Information sent to Facebook was sent alongside the Plaintiffs' and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.

82. But the c_user cookie is not the only means by which Meta can identify a specific individual from the web communication.

83. When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

84. Regardless of whether a user is logged into a Facebook account, the "fr" cookie contains an encrypted Facebook ID and browser identifier. Facebook, at a minimum, uses the "fr" cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.

85. The cookies listed above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Meta created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

86. Defendant, however, also revealed its website visitors' identities via more powerful first-party cookies such as the "_fbp" cookie that Facebook uses to identify a particular browser and user who had interacted with Defendant's website.

87. Importantly, the "_fbp" cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the "fr" cookies and "c_user" cookie, the "_fbp" cookie functions as a first-party cookie—i.e., a cookie that was created and placed on the website by Defendant.

88. In summation, Meta, at a minimum, uses both first-party and third-party cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, patients' information and

identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

**F. Defendant Collected & Disclosed Plaintiffs' and Class Members' Private Information to Google Through the Use of Google Tracking Tools.**

89. Google offers Tracking Tools to entities like Defendant for "free." However, access to the Google tools is also bartered in exchange for Defendant's patients' PHI. By implementing and configuring Google Analytics, Defendant caused Plaintiffs' and Class Members' communications to be intercepted by and/or disclosed to Google.

90. Defendant's Source Code implemented with Google Analytics (G-CLDCJZXR58), Google Tag Manager (UA-45690731 and GTM-M2CHSH), and Google Ads Conversion Tracking (AW-981424425) manipulated the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Google.

91. Google Analytics is marginally different than the Meta Pixel but essentially accomplishes the same goal: tracking what a user communicates to Defendant's website.[12] Google Analytics records the exact page and title; and Google Ads would fire three conversion trackers marking the user as a potential patient. These transmissions also occurred contemporaneously, invisibly, and without the patient's knowledge.

---

[12] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, BOLTIC (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel (last visited June 30, 2026).

92. Several different methods allow marketers and third-parties to identify individual website users, but the examples below demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's CID, and allows Google to link the user's online communications and interactions to their individual Google Account.

93. Google receives at least five cookies when Defendant's website transmits information via their tracking tool**:**

**Request Cookies** ☐ show filtered out request cookies

| Name | Value | Domain | Path | Expir... | Size | HttpO... | Secure | Same... | Partiti... | Cross... | Priority |
|---|---|---|---|---|---|---|---|---|---|---|---|
| __Secure-3PAPISID | M54-_D9WzuDF3Jey/AWzeCeShhrLc3c9... | .goog... | / | 2027... | 51 | | ✓ | None | | | High |
| __Secure-3PSID | g.a000BAnLuzrb4KoKrqQUELTQYWGhSJ... | .goog... | / | 2027... | 167 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDCC | AKEyXzVQk_fJZrR00pkQp7gzpJ1MWzCB... | .goog... | / | 2027... | 90 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDTS | sidts-CjIBPWEu2et_UkVU3JMYSaeHgkA... | .goog... | / | 2027... | 94 | ✓ | ✓ | None | | | High |
| NID | 533=m0jdWQwCTY1RPtX3kGmGGIbe1YG... | .goog... | / | 2027... | 1059 | ✓ | ✓ | None | | | Medi... |

*Figure 1. Screenshot from Defendant's network traffic report for Google Analytics list of cookies sent out.*

94. The NID cookie contains an encrypted Google Account ID and browser identifier. Google, at a minimum, uses the NID cookie to identify users, and this particular cookie can stay on a user's website browser for up to 6 months to identify the user's history on the website.[13]

95. The cookies listed in the image above is commonly referred to as third-party cookies because they were "created by a website with a domain name other than

[13] *Id.*

the one the user is currently visiting"—i.e., Google. Although Google created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Google would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

96. Defendant also revealed its website visitors' identities via first-party cookies such as the _ga cookie that google uses to identify a particular browser and a user:[14]

| | | |
|---|---|---|
| _ga | GA1.1.594783272.1780608145 | .joionline.net |

*Figure 2. Screengrab from Defendant's network traffic report depicting the first party cookie _ga.*

Importantly, the _ga cookie is transmitted to Google even when the user's browser is configured to block third-party tracking cookies because, unlike the NID cookies and CID cookie, the _ga cookie functions as a first-party cookie—i.e., a cookie that was created and placed on the website by Defendant.

97. In summation, Google at a minimum, uses the NID, _ga, and CID cookies to link website visitors' communications and online activity with their corresponding Google Accounts, and because the tracking tools are automatically programmed to transmit data via both first-party and third-party cookies, patients'

---

[14] *Id.*

information and identities are revealed to Google even when they have disabled third-party cookies within their web browsers.

98. As the user navigates the site, Google Analytics sends a special "file download" event to its servers containing: (1) exact file name "facesheet.pdf"; (2) the full URL to the medical form; (3) time on the page before downloading; and (4) assigns a permanent tracking ID linking the user to all previous visits.

99. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present, and future medical care of Plaintiffs and Class Members. Without discovery, Plaintiffs are unable to know precisely the configuration in the Google Tag Manager Container or to determine precisely what form content and fields may also have been disclosed.

100. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, and events each (1) related to the past, present and future medical care of Plaintiffs and Class Members, (2) conferred and indicated that the user (Plaintiffs and Class Members) was a patient or prospective patient at the time of the tracked web activity and (3), as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

101. Each of these web communications were disclosed without Plaintiffs' or Class Members' express written consent and without a HIPAA-compliant business

associate agreement governing the transfer of data between Defendant and Google, Defendant and Meta, or any downstream parties.

102. Google collected vast quantities of Plaintiffs' and Class Members' Private Information via the Tracking Tools installed on Defendant's Website.

**G. Google Identifiers**

103. Defendant and Google tracked each Plaintiff and Class Member who visited the Website through persistent identifiers associated with Universal Analytics and Google Ads.

104. Google, like Meta, uniformly stored a unique identifier in its logs for each Plaintiff and Class Member, whether in private browsing mode or non-private browsing mode. The unique identifier can then be used to connect the individual with the collected browsing activities on that Website. The value in the identifiers is that Google and Defendant can then use the identifiable behavioral data for serving personalized ads.[15]

105. Similarly, Google "stores users' logged-in identifier on non-Google websites … in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is

[15] *See Brown*, 685 F. Supp. 3d 909 (denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *See also Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associate*s, HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 30, 2026) ("Such PHI may include, for example, an individual's IP address . . . .").

associated with the data Google collects from and utilizes the user's browsing activities on that website."[16]

106. "Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[17] Google users who are logged-in to their Google accounts also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.[18]

107. Google also tracks all users, whether logged into Google or not, with persistent IDs through Universal Analytics and Google Ad Words.

108. If the Plaintiff or Class Member was logged-in to their Google accounts while navigating the Website, Google's logs would include an additional identifier to further match an individual's browsing activities for additional tracking to serve personalized ads.[19]

109. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present, and future medical care of Plaintiffs and Class Members.

110. At a minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiffs' and Class Members' patient status.

---

[16] *See Brown*, 685 F. Supp. 3d at 925 n.11 (explaining how Google tracks user data).
[17] *Id.*
[18] *See id.* (quoting Google employee deposition testimony explaining how Google tracks user data).
[19] *Id.* (quoting Google employee deposition testimony explaining how Google tracks user data).

111. Due to the vast network of information held by Google and its highly sophisticated algorithm, Google can easily and reliably match the IP addresses, device information, and the unique identifiers to connect an individual with the tracked browsing activity.

112. Google then utilizes such information to design and offer tailored marketing products such as Google Ad Words, which can be used for targeted advertising on those individuals.

113. Defendant gained access to and utilized these powerful and valuable retargeting products in exchange for Plaintiffs and Class Members Private Information.

114. A user's Google ID ("GID"), a unique identifier similar to the c_user ID Facebook uses and described above, is also included and sent to Google identifying the user within Google's own system.

**E. Other Digital Identifiers (IP Address and Browser Fingerprinting)**

115. The baseline configurations on Meta and Google also collected and disclosed extensive amounts of additional user data that can be used to identify the specific user, including, but not limited to: the user's IP address. type of device, operating system, and browser details (browser fingerprinting).

116. On information and belief, through the use of the Tracking Tools on Defendant's Website, Defendant also disclosed and otherwise assisted third parties with intercepting Plaintiffs' and Class Members' IP addresses.

117. An IP address is a number that identifies the address of a device connected to the Internet.

118. IP addresses are used to identify and route communications on the Internet.

119. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

120. Meta tracks every IP address ever associated with a Facebook user.

121. Additionally, Meta tracks IP addresses for use of targeting individual homes and their occupants with advertising.

122. As to Google, whenever a user visits a website that is running Google Analytics and Google Ad Manager, Google's software scripts on the website surreptitiously direct the user's browser to send a secret, separate message to Google's servers in California, which includes the user's IP address, the user's geolocation, information contained in Google cookies, any user-ID issued by the website to the user, and information about the browser the user is using.

123. Accordingly, Google was also likely receiving patients' communications and PHI alongside the patients' IP address.

124. In addition to these personally identifiable persistent identifiers, upon receiving information from Defendant's Website, Google and Meta also utilize a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is

information collected about a computing device that is used to identify the specific device.

125. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[20]

126. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

127. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[21]

128. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[22] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

---

[20] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017), https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

[21] Justin Schuh, *Building a More Private Web*, GOOGLE (Aug. 22, 2019), https://blog.google/products/chrome/building-a-more-private-web/.

[22] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY (Apr. 11, 2024), https://www.pixelprivacy.com/resources/browser-fingerprinting.

129. Browser-fingerprints are personal identifiers. Google Analytics and other Google tracking tools can collect browser-fingerprints from website visitors.

130. Without discovery and full disclosure of the complete source code, Plaintiffs cannot identify all browser fingerprint data at issue. However, review of the available code shows full browser/OS fingerprints, and screen/viewport sizes. Upon information and belief, additional data points were likely transmitted allowing for more accurate and identifiable browser fingerprinting.

**F. Web User's Journey on the Website**

131. To add additional detail to the allegations, the following paragraphs will walk through the process of what Plaintiffs and Class Members would experience when utilizing the Website, as well as showing what was happening secretly in the Source Code surveilling their activity.

**1. JOI Homepage**

132. As patients enter the homepage of the site, they entered a secretive digital world that was surveilling each movement and each decision they made on the site, as reflected in the image below.




*Figure 3. Screenshot of network traffic taken from Defendant's website which shows that the Tracking Tools are actively installed and firing on Defendant's Homepage.*

133. As depicted in Figure 3, immediately upon entering the homepage, Tracking Tools are firing to capture, *inter alia*, the user's visit and page views, so Defendant, Meta, Google can reissue targeted advertisements to that particular user.

### 2. Selecting a Location

134. As a patient navigates the website, they can review a webpage listing JOI locations throughout the Jacksonville area. Upon landing on that page, and before clicking any locations, the locations page is littered with both Meta and Google Tracking tools.




*Figure 4. Screenshot of network traffic taken from Defendant's website, wherein the patient has clicked on the "Locations" tab. The right side of the screenshot evidences that the Tracking Tools are installed, including the unique identifiers for both Facebook and Google Tracking Tools.*

135. The user then can select "Schedule an Appointment Online for JOI Amelia Island." Once the user clicks that, the User is directed to JOI's "EZBooking" Portal. Upon entering that site, the Website immediately fires Microsoft's ASP.NET cookie which is built in session tracking for the user before they input information. ASP.NET is a first party cookie which was installed by JOI to track the user's sessions on their website.[23]

---

[23] *See Session and State Management in ASP.NET Core*, MICROSOFT https://learn.microsoft.com/en-us/aspnet/core/fundamentals/app-state?view=aspnetcore-10.0 (last visited August 10, 2026)




*Figure 5. Screenshot of network traffic showing ASP.NET_SessionID cookie firing on the appointment booking webpage.*

136. In addition to booking an appointment, the user can navigate to the specific page about JOI Amelia Island (Nassau). On that page, both Google and Facebook Tracking tools are installed and recording which JOI location the user is researching and/or from which they are receiving treatment.



*Figure 6. Screenshot from user's network traffic on the JOI Amelia Island (Nassau) page showing Meta Pixel and Tracking Tools firing on the page. Specifically showing the specific id=1760345740860348 and "fr" cookie that contains a user and browser identifier.*




*Figure 7. Screenshot from user's network traffic on the JOI Amelia Island (Nassau) page showing Google Tracking Tools firing on the page.*

137. As this scenario plays out, with thousands of users searching for and communicating information about their medical care on Defendants website, the data collected from the Facebook Pixel and Google Tracking tools are then linked to both Google and Meta organization and monetization. Through these tools, Defendant had access to sophisticated data analytics reports that can be utilized for website optimization, profile building, and advertising campaign optimization.

### 3. Reviewing a Physician

138. The user can then review a page listing physicians who practice at JOI. Upon clicking a specific physician, like Dr. Brooks in the below example, the user's browser automatically sent an HTTP Request to Defendant's web server. Defendant's

web server then automatically returned an HTTP Response, which loads the Markup for that particular webpage. The user only sees the markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website. Google is now informed that the patient is considering treatment with Dr. Brooks, who specializes in "Orthopedic surgery, Adult Reconstructive Surgery, Hip and Knee Replacement, Anterior Hip Replacement, Hip, Partial Knee Replacement, Robotic Knee Replacement." Therefore, Google becomes aware of what conditions the user may have or is researching.




*Figure 8. The left side of Figure 8 is a screenshot from Defendant's website wherein the patient has clicked on Dr. Brooks' landing page. The right side of Figure 8 is a screenshot of network traffic taken from Defendant's website, which shows the live transmission of the patient's communications to Google wherein the click on Dr. Brooks's landing page.*

139. When reviewing the source code for Dr. Caputo's page, Defendant has several Google Tracking Tools and the Facebook Pixel enabled which let Defendant,

Google and Meta know that the patient is interested in receiving care from this particular doctor.




*Figure 10. Screenshot from Defendant's website displaying that there are 16 cookies tagged to Dr. Brook's webpage on JOI's website.*

140. Indeed, Figure 10 displays that Defendant transmitted 16 different cookies, including those from both Meta ("fbp") and Google (various "_ga" prefix cookies), that communicate that the user has sought orthopaedic care from Dr. Brooks.

141. Thus, without alerting the user, Defendant's Tracking Tools collected and sent the web communications the user made via the webpage to Meta and Google, and the images below confirm that the communications contain the user's Private Information.

**4. Researching Treatments and Conditions**

142. After visiting Dr. Brook's webpage, the user can click links listed under his specialties. If the user navigates to the link for "Partial Knee Replacement," JOI provides the user with certain information about treatments and conditions related to knee pain and knee replacement surgery.

143. If a user navigates to a page about a Knee Speciality, that is communicated to Meta and Google. In the below example, the user visited the Knee Speciality page through Dr. Brooks' listed specialties, which caused the tracking pixels to fire.

144. Much like when the user selects a doctor, when a user navigates to the page listing treatments/conditions, the user's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server then automatically returns an HTTP Response, which loads the Markup for that particular webpage. Similarly, the user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website. Meta and Google are now informed that the patient is seeking treatment for their knee through visiting Dr. Brooks' webpage.




*Figure 11. Screenshot of web traffic from joionline.net/specialty/knee wherein the patient navigated to knee specialty page through Dr. Brooks' listed specialties. The request URL featured shows that the user's activity is being sent to Google, and indicates how the user landed on this treatment page (as highlighted).*

145. Notably, this particular HTTPS request signals to Google precisely how the user landed on this treatment page. For instance, it would show that the user first clicked on the physicians page, then Dr. Brooks, then the Knee treatment page.

146. The unauthorized transmission of the patients' interactions with Defendant's website is highly offensive to the reasonable person, as their browsing history is directly linked to their confidential PHI, and that browsing history is being shared with Meta and Google.

### G. The Disclosure of Private Health Information to Google and Meta Violated HIPAA Regulations.

147. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

148. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d to 1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

149. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[24]

---

[24] *The HIPAA Privacy Rule*, HHS.GOV (last visited Aug. 10, 2026), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

150. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

151. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that: (1) "[i]s created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

152. Under the HIPAA de-identification rule, in order to adequately de-identify a data set relating to healthcare services, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

a. Names;

> ***
>
> H. Medical record numbers;
>
> ***
>
> J. Account numbers;
>
> ***
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristic, or code…;and"
>
> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514(b)(2).

153. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[25]

---

[25] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance With the Health Insurance Portability and Accountability Act (HIPAA) Privacy*

154. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, *the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing*. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[26]

155. Here, Defendant effectively traded its patient list for access to these valuable marketing tools. And neither Plaintiffs nor any Class Member provided express written consent for the use of their PHI for marketing purposes.

156. While there was not a direct sale of the patient list, by disclosing the patient status of all the users of the Website in exchange for valuable marketing tools, Defendant engaged in a bartered commercial transaction whereby its patient list was constructively and effectively sold to the world's largest marketing companies.

157. The Tracking Tools allow advertisers to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.

---

*Rule*, HHS (Nov. 26, 2012), available at https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[26] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Aug. 10, 2026).

158. Defendant utilized the Tracking Tools on numerous sensitive pages of its Website with the intent to share and disclose Plaintiffs' and Class Members' confidential web communications and behavioral data with Google and Meta.

159. Whether intentional, reckless, or negligent, the data shared with Meta and Google was PHI.

160. Upon information and belief, Defendant utilized the Tracking Tools and shared PHI with Meta and Google with the intent to maximize its marketing return on investment.

161. Upon information and belief, Defendant accessed and utilized Meta Business Suites and Ads Manager Reports to review and utilize the Meta Pixel data to refine and design its advertising strategies. These strategies were intended to monetize Plaintiffs' and Class Members' data and included one or more of the following: website analytics, advertising optimization, conversion tracking, and/or email marketing.

**H. Meta Ads and Business Suites**

162. The Meta Pixel does not work in isolation but connects a web user's browsing activity directly to the powerful Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager.

163. After intercepting and collecting the Private Information, Meta processes the data, analyzes it, segments and assimilates it into datasets like Core Audiences and

Custom Audiences. If the Website visitor is also a Facebook user, Meta will associate the collected information with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

164. In addition to the Website analytics, Meta Pixel creates value for the Defendant by providing Defendant with access to sophisticated algorithms and computer learning (AI) tools that allow Defendant to further utilize Plaintiffs' and Class Members' behavioral data on the website to build highly targeted audiences. These audiences include both custom audiences and lookalike audiences.

165. A "custom audience" is used to re-target users who have previously visited a website or taken specific actions on the website. For example, if a user visited Defendant's Website and didn't request an appointment, a custom audience could be built from the data gathered from the Meta Pixel to retarget those users with specific ads to try to get them to come back to the Website to schedule an appointment.

166. A "lookalike audience" is designed with the goal of reaching new potential customers who share similar characteristics, behaviors, and demographics as

the existing high value customers tracked by the Meta Pixel. In this scenario, if Defendant wanted to target potential patients for urological medical treatment, it could analyze, segment and use the data collected from patients who completed "book an appointment forms" for urological medical treatment to build a lookalike audience. That audience would then be used in combination with Meta's vast ecosystem and advertising platform to get ads in front of individuals with the same or similar profiles as the current urological medical treatment patients of Defendant.

167. The Meta Pixel further provides real-time data to Meta's algorithms, allowing for automatic optimization of ad delivery. Meta's systems use the data provided from the Meta Pixel to learn and predict which users are more likely to convert and complete a request for appointment and will automatically target those potential patients to maximize the ad spend. In other words, the powerful Meta algorithm that has been gathering data from all aspects of the internet incorporates the patient data from the Website to place digital advertisements in front of audiences with the greatest chance of becoming a new patient of Defendant. The per patient conversion cost is then expected to be far lower than if Defendant attempted to use less sophisticated and targeted forms of advertising like traditional media, where the ad impression cost is much higher and the cost to convert a patient is higher.

168. Defendant is in exclusive control over whether CAPI was implemented. But the availability of the Tool shows notice of the privacy concerns when utilizing the Meta Pixel. Moreover, while Defendant is in exclusive control of any audience

marketing campaigns it built and utilized, the presence of targeted Facebook advertisements online indicates that Defendant was utilizing Meta Business tools to create audiences and monetize Plaintiffs' and Class Members' browsing activity and Private Information collected from the Website.

169. At a minimum, Defendant disclosed sufficient Private Information from which Meta could infer Plaintiffs' and Class Members' patient status.

**I. Defendant's Marketing Practices Violated HIPAA Standards**

170. While Plaintiffs does not assert a private right of action under HIPAA, the intentional violations of the statutory duties and standards under HIPAA constitute criminal and civil acts subject to penalties imposed by 42 U.S.C. § 1320d-6. Here, Defendant knowingly implemented Tracking Tools with the intent of collecting and disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b).

171. The primary motivation and a determining factor in Defendant's collection, interception, and disclosure of Plaintiffs' and Class Members' Private Information was the use of patient data for advertising in the absence of express written consent. Such conduct gives rise to a violation of HIPAA.

172. Moreover, there is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such

cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320d-6(b)(3).

**J. Defendant's Marketing Conduct Also Violated Florida Law**

173. Florida law has established policies and procedures for the maintenance, preservation, and storage of patient medical records.

174. All patient records "are confidential." Fla. Stat. § 395.3025(4). In addition, "Florida law recognizes the confidentiality of a patient's medical record pursuant to the Right of Privacy clause, contained in Article I, Section 23 of the Florida Constitution."

175. Further, the Florida Patient's Bill of Rights provides that "Every patient who is provided healthcare services retains certain rights to privacy, which must be respected without regard to the patient's economic status or source of payment for his or her care." Fla. Stat. § 381.026(4)(a)(2).

176. Finally, Florida Statutes § 934.10 provides, in pertinent part, as follows:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

177. Indeed, Defendant willingly facilitated Google's and Facebook's interception and collection of Plaintiffs' and Class Members' Private Information by embedding the Facebook Pixel on its Website.

178. As described herein, Defendant used the Tracking Tools and variety of other items as devices or apparatus to intercept wire, electronic, or oral communications made by Plaintiffs and other Class Members.

179. Accordingly, Defendant's actions described herein violated Florida law.

**K. Defendant Was Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures to Google and Meta.**

180. Defendant's further use of Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

181. In exchange for disclosing Private Information of its patients, Defendant was enriched and enhanced by advertising services and more cost-efficient marketing on its platform.

182. Upon information and belief, Defendant utilized Plaintiffs' and Class Members' data that was collected through Meta and Google marketing tools to implement one or more of the following marketing tactics: website optimization, audience building, and targeted campaigns, all designed to target current and potential patients to drive more profit. Defendant directly benefited through use of the

intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

183. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and Florida law.

**L. Plaintiffs' and Class Members' Private Information Had Financial Value**

184. Plaintiffs' data and Private Information has economic value in established marketplaces. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients. Google has recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

185. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil."[27] Conservative estimates suggest that in 2018, internet companies earned $202 per American user from mining and selling data. That figure is only expected to keep

[27] *See, e.g.*, Vahid, *Data Is the New Oil: A Powerful Metaphor with a Catch*, MEDIUM (May 23, 2026) https://medium.com/@vhid/data-is-the-new-oil-a-powerful-metaphor-with-a-catch-35899859bcb6 (last visited Aug. 11, 2026).

increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.[28]

186. The value of health data, including patient lists in particular, is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[29]

187. Moreover, healthcare systems commonly value the lifetime value of a patient and the value of a marketing lead and impression, as well as the value of the conversion of a new patient.

188. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[30]

---

[28] *See* Robert J. Shapiro, *What Your Data Is Really Worth to Facebook*, WASHINGTON MONTHLY (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/.

[29] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME.COM (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited June 30, 2026).

[30] *See* Christina Farr, *Hospital Execs Say They Are Getting Flooded With Requests For Your health Data,* CNBC, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited July, 20, 2026).

189. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[31]

190. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

191. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

192. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through

[31] VERO, *How to Collect Emails Addresses on Twitter* https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited June 30, 2026).

which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

193. Additionally, health care data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[32]

194. Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[33]

195. Data brokers combine online and offline data to market to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including sensitive inferences related to health conditions. Some data brokers have been found to store data indefinitely posing significant privacy risks.[34]

196. Data brokers do not obtain the data directly from consumers, rather they obtain it through various sources including partnerships with third party marketers that utilize tracking tools. While each data broker source may provide only a few data elements about a consumer's activities a data broker can combine the data sets to form a more detailed profile of the consumer's life.

---

[32] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.
[33] *FTC Recommends Congress Require the Data Broker Industry to be More Transparent and Give Consumers Greater Control Over Their Personal Information*, FTC (May 27, 2014), https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater.
[34] *Id*.

197. In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem. The web trackers serve as pivotal components in the data broker ecosystem by facilitating the collection of online activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics.[35]

198. The U.S. data broker market is projected to grow from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven through the data harvested from the pixels and trackers on the website.

199. As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by mail, research medications online, or respond to pharmaceutical ads or other treatment advertisements. These predictive models are then sold and used for targeted advertising.

200. The lack of transparency in the data brokering ecosystem makes it unknown whether Meta and/or Google sold or traded any of the data they received through the Tracking Technology at issue.

201. However, it is indisputable that the data at issue given its medical data is highly valuable for segmentation and profile building.

---

[35] ONLINE DATA PRIVACY REPORT: WEBSITE PRIVACY AND COMPLIANCE CHALLENGES (Mar. 2024), https://lokker.com/api/directus-assets/419fdf43-83ba-4dba-9821-d8eff94f956a (last visited July 21, 2026)

202. Once the data is shared and disclosed to any of the Unauthorized Third-Party Marketers, the patients, Class Members, and Defendant lose control over its usage and distribution.

**M. Plaintiffs and Class Members' Common Experience**

203. Plaintiffs and Class Members are Defendant's patients who received healthcare services from Defendant. As part of the medical services, Plaintiffs and Class Members used Defendant's Website to communicate Private Information to Defendant on numerous occasions. At all times, while using the Website, Plaintiffs and Class Members had an expectation of privacy that the Private Information provided to Defendant would remain private and confidential.

204. Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

205. Plaintiffs and Class Members were not aware that their Private Information would be disclosed to the Unauthorized Third Parties and that Defendant was utilizing their Private Information for marketing purposes because Defendant did not acquire their consent.

206. Plaintiffs and Class Members were Facebook and/or Google users.

207. As Plaintiffs and Class Members used Defendant's Website, the Website's Source Code configured with Tracking Tools sent a secret set of instructions

back to the Plaintiffs' and Class Members' browsers, causing the Tracking Tools to uniformly send Plaintiffs' and Class Members' Private Information to the Unauthorized Third Parties.

208. Accordingly, during the same transmissions, the Website routinely provided the Unauthorized Third-Party Marketers with digital identifiers allowing the Third Parties to connect the Plaintiffs and Class Members with their Private Information.

209. Furthermore, following the disclosure, Plaintiffs' and Class Members' Private Information was aggregated and analyzed through the Unauthorized Third-Party Marketers analytics tools and reports. From there, the aggregated data could be segmented and linked to specific user profiles for use in building "custom" and "lookalike audiences" and was incorporated into the Unauthorized Third-Party Marketers algorithms for other avenues of re-targeting.

210. Once released to the digital marketing ecosystem, the collected data may also be shared or combined with data broker aggregated data and profiles for additional marketing reach.

211. Upon information and belief, Defendant monetized Plaintiffs and Class Members Private Information by building custom and lookalike audiences to target and re-target patients and potential patients. By utilizing the Unauthorized Third-Party Marketer's tools, Defendant was able to save substantial marketing costs while

decreasing its cost per conversion, as well as likely increasing its overall new patient conversion.

212. Without discovery, Plaintiffs and Class Members are unable to know the full extent of the improper disclosure and use of their Private Information.

**N. Plaintiffs' Experiences**

***Plaintiff A.C.'s Experience***

213. Plaintiff has been a patient and received medical care at Defendant's facilities for several years, and she has used the Website consistently throughout her treatment, including most recently earlier in February of this year.

214. Plaintiff accessed Defendant's Website on her computer and/or mobile device for the purpose of finding and obtaining medical treatment for her specific conditions, which she undertook at Defendant's direction and with Defendant's encouragement.

215. Plaintiff specifically recalls using the Website to search for specialists and treatment related to her condition, and in doing so, she communicated Private Information via the Website concerning her own medical condition(s), medical symptoms, desired treatments, and more via the "Find a Physician" webpage and other portions of the Website.

216. Plaintiff also used the Website to complete patient web forms, schedule appointments, pay invoices, and communicate Private Information concerning her medical treatment.

217. During all relevant times, Plaintiff has had an active Facebook account. Shortly after using the Website, she began seeing targeted advertisements related to her own medical symptoms, conditions, and the treatments she sought from Defendant via the Website.

218. Based on the timing and specificity of these targeted advertisements, she believes her Private Information was transmitted to Facebook via Defendant's Website and the Facebook Pixel that Defendant installed onto the Website.

219. During all relevant times Plaintiff has also had a Google account and believes that the Private Information she communicated via the Website was also transmitted to Google via Defendant's use of Google Analytics on the Website.

220. The Private Information that Facebook and Google received from Defendant included specific facts concerning her medical condition, was personally identifiable (linked to Plaintiff), and was not anonymized or redacted.

221. Defendant intercepted and/or facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

222. As a patient, Plaintiff reasonably expected that her online communications with Defendant via the Website were solely between herself and Defendant and that Defendant would not transmit her Private Information to Facebook or Google for marketing purposes.

223. But for her status as Defendant's patient, Plaintiff would not have disclosed her Private Information to Defendant or used its Website.

224. When Plaintiff used the Website, her Facebook ID, IP address, device IDs and other personal identifiers were sent to Facebook and Google alongside the substance of her communications.[36]

225. The presence of Facebook advertisements confirms Defendant's unlawful transmission of Plaintiff's Private Information to Facebook.

226. In sum, Defendant's Tracking Tools transmitted Plaintiff's highly sensitive communications and Private Information to Facebook and Google, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

227. By doing so without Plaintiff's consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed Plaintiff's Private Information.

228. Upon information and belief, as a "redundant" measure to ensure Plaintiff's Class Members' Private Information was successfully transmitted to third parties like Facebook and Google, Defendant implemented server-based workarounds

[36] After intercepting and collecting this information, Facebook and Google process it, analyze it, and assimilate it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

like Conversions API to send Plaintiff's and Class Members' Private Information from electronic storage on Defendant's server directly to Facebook.

229. Plaintiff suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendant via the Website.

230. Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

***Plaintiff A.B.'s Experience***

231. Plaintiff A.B. is a JOI patient. Plaintiff A.B. had knee surgery at JOI a year ago, and subsequently treated at JOI facilities for rehabilitation following the surgery.

232. Plaintiff accessed Defendant's Website on his computer and/or mobile device for the purpose of finding and obtaining medical treatment for his knee and rehabilitating same after surgery, which he undertook at Defendant's direction and with Defendant's encouragement.

233. Plaintiff A.B. relied on JOI's Website and Online Platforms to communicate confidential patient information. Plaintiff A.B. began using the Website and Online Platforms a year ago. Plaintiff A.B. uses the Website to search

for his doctors, treatment locations, and contact information. He used the Website's "Find a Physician" tool, as well as the patient portal. He also used the Web Properties to schedule appointments and make payments.

234. Plaintiff A.B. has used the "Find a Physician" feature to search for his rehabilitation doctor for his knee surgery.

235. Plaintiff A.B. accessed Defendant's Website and Online Platforms at Defendant's direction and encouragement. Plaintiff reasonably expected that his online communications with JOI were confidential, solely between himself and JOI, and that, as such, those communications would not be transmitted to or intercepted by a third party.

236. Plaintiff A.B. provided his Private Information to Defendant and trusted that the information would be safeguarded according to JOI's privacy policies and the law.

237. Through its use of the Meta Pixel, Defendant disclosed to Facebook

a. Plaintiff A.B.'s identity;

b. Plaintiff A.B.'s status as a patient;

c. Plaintiff A.B.'s seeking of medical treatment;

d. Plaintiff A.B.'s health conditions and the treatment he sought;

e. Plaintiff A.B.'s location;

f. Plaintiff A.B.'s email address, phone number, and ZIP code;

g. the name of Plaintiff A.B.'s treating physician and clinic location;

h. when Plaintiff A.B.'s accessed Defendant's patient portal; and

i. Plaintiff A.B.'s first name.

238. By failing to receive the requisite consent to disclose Plaintiff A.B.'s Private Information, JOI violated its agreements with Plaintiff A.B., its own policies, and the law.

239. Since using Defendant's Website, Plaintiff A.B. has been targeted by online advertisements from JOI.

240. Plaintiff A.B. paid for Defendant's healthcare services, which included reasonable privacy and data security protections for Plaintiff A.B.'s Private Information; however, Plaintiff did not receive the privacy and security protections for which he paid.

241. Plaintiff A.B. first discovered that Defendant was using the Meta Pixel and other tracking technologies to gather and disclose his Private Information in October of 2023.

Because of Defendant's Disclosure, Plaintiff A.B. has suffered injuries, including monetary damages; loss of privacy; unauthorized disclosure of this Private Information; unauthorized access to his Private Information by third parties; use of his Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of his Private Information; lost benefit of his bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of his information.

**O. Class Wide Injuries, Damages, and Remedies**

242. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

243. Consequently, Plaintiffs individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiffs and the putative Class have suffered significant damages and seek the following remedies:

a. Compensatory damages;

b. Loss of benefit of the bargain;

c. Conversion (FMV value of the use of the data for marketing);

d. Statutory damages;

e. Nominal damages, in the alternative;

f. Consequential and future damages for reasonable and necessary data monitoring services including data broker and dark web monitoring, as well as the cost of removing the disclosed data and profiles from data broker networks;

g. Restitution for the FMV of the misuse of the Private Information;

h. Disgorgement of profits or cost savings derived from misuse of Plaintiffs' and Class Members' Private Information;

i. Injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

244. The injunctive relief sought includes:

a. Removal of the Tracking Tools from sensitive parts of the Website;

b. Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

c. Deletion of all audience profiles and campaigns built from data gathered through the Tracking Tools and from Plaintiffs' and Class Members' Private Information;;

d. Deletion of Plaintiffs' and Class Member data from all identifiable third-party broker lists;

e. Enjoining Defendant from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

f. Enjoining Defendant from utilizing any other Tracking Technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with third parties.

g. Other relief as ordered by the Court.

## TOLLING

245. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Meta and Google because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

246. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

247. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Tracking Tools on Defendant's Web Properties.

248. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

249. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

250. Numerosity, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief,

there are hundreds of thousands of individuals whose PII and PHI have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

251. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

g. Whether Defendant violated the consumer protection statutes asserted as claims in this Complaint;

h. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

252. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

253. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

254. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

255. Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to the Plaintiffs.

256. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and

appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

257. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

258. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

259. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

260. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

261. Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

262. Plaintiffs reserve the right to amend or modify the Class definition as this case progresses.

**<u>COUNT I</u>**
**VIOLATION OF THE FLORIDA SECURITY COMMUNICATIONS ACT**
**(On Behalf of Plaintiffs and the Class)**

263. Plaintiffs repeat the allegations contained in paragraphs 1-262 as if fully set forth herin and bring this Count individually and on behalf of the proposed Class.

264. The Florida Secretary of Communications Act ("FSCA") is codified at Fla. Stat. § 934.01, *et seq*. The FSCA begins with legislative findings, including:

> On the basis of its own investigations and of published studies, the Legislature makes the following findings…(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.

265. Florida Statutes § 934.10 provides, in pertinent part, as follows:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause

> of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

266. The FCSA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

267. At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook to intercept Plaintiffs' and Class Members' internet communications while accessing the Website, including the contents thereof—i.e., the URL visited, the medical conditions and types of doctors searched, whether and with whom the patient had a medical televisit, payment of medical bills, and the contents of any live chats. Such information not only constitutes protected health information, it also represents the substance, import, and meaning of the communications between Plaintiffs and other Class Members had with Defendant's Website.

268. As medical patients, Plaintiffs and other Class Members had a reasonable expectation of privacy in the electronic communications they had with Defendant's Website. The application of the Facebook Pixel is not required by law.

269. Nonetheless, these electronic communications were transmitted to and intercepted by a third party (i.e., Facebook and Google) during the communication and without knowledge, authorization, or consent of Plaintiffs and Class Members. That is because Defendant intentionally inserted an electronic device into its website that, without the knowledge and consent of Plaintiffs and Class Members, recorded and transmitted the substance of their confidential communications with Defendant to a third party.

270. Defendant willingly facilitated Google's and Facebook's interception and collection of Plaintiffs' and Class Members' Private Information by embedding the Facebook Pixel on its Website.

271. Defendant used the following items as a device or apparatus to intercept wire, electronic, or oral communications made by Plaintiffs and other Class Members:

a. The computer codes and programs Facebook and Google used to track Plaintiffs' and Class Members' communications while they were navigating the Website;
b. Plaintiffs' and Class Members' browsers;
c. Plaintiffs' and Class Members' computing and mobile devices;
d. Facebook's web and ad servers;

e. The web and ad-servers from which Facebook and Google tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate https://www.joionline.net;

f. The computer codes and programs used by Facebook and Google to effectuate its tracking and interception of Plaintiffs' and Class Members' communications while they were using a browser to visit Defendant's website; and

g. The plan Facebook and Google carried out to effectuate its tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser or mobile application to visit Defendant's website.

272. Defendant fails to disclose that it is using the Facebook Pixel and Google Tag Manager and associated programs specifically to track and automatically and simultaneously transmit communications to a third party, i.e., Facebook and Google.

273. To avoid liability under the FCSA, a defendant must show it had the consent of *all* parties to a communication.

274. The patient communication information that Defendant transmits while using the Facebook Pixel, such as doctor appointment booking information and names, IP addresses, and home addresses constitutes protected health information.

275. As demonstrated hereinabove, Defendant violates the FCSA by aiding and permitting third parties to receive its patients' online communications in real time through its Website without their consent.

276. By disclosing Plaintiffs' and Class Members' Private Information, Defendant violated Plaintiffs' and Class Members' statutorily protected privacy rights.

277. As a result of the above violations and pursuant to Florida Statutes, § 934.10, Plaintiffs and Class Members are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

278. Under the statute, Defendant is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**COUNT II**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Class)**

279. Plaintiffs repeat the allegations contained in paragraphs 1-262 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

280. The Private Information of Plaintiffs and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

281. Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

282. Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

283. Defendant's unauthorized disclosure of Plaintiffs' and Class Members' Private Information to Meta and Google is highly offensive to a reasonable person.

284. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

285. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant facilitated Meta and Google's simultaneous eavesdropping and wiretapping of confidential communications.

286. Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed the Tracking Tools onto its Website because the purpose of the Tracking Tools is to track and disseminate individuals' communications with the Website for the purpose of marketing and advertising.

287. Because Defendant intentionally and willfully incorporated the Tracking Tools into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

288. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiffs and the Class Members were disclosed to a third party without authorization, causing Plaintiffs and the Class to suffer damages.

289. Plaintiffs, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

290. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and still in the possession of Meta and Google and the wrongful disclosure of the information cannot be undone.

291. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook, which upon information and belief, continues to possess and utilize that information.

292. Plaintiffs, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
***(On behalf of Plaintiffs and the Class)***

293. Plaintiffs repeat the allegations contained in paragraphs 1-262 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

294. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and the Class Members provided their Private Information.

295. When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information or use it for non-medical purposes without consent.

296. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to maintain the confidentiality and limited scope of use.

297. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to the Unauthorized Third-Party Marketers without consent.

298. Defendant further breached the implied contracts by using Plaintiffs' and Class Members' Private Information without consent.

299. As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiffs and Class Members sustained numerous injuries including but not limited to the loss of the benefit of their bargain, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

300. Consequently, Plaintiffs, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and, in the alternative, nominal damages. Plaintiffs further seeks restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiffs seeks injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

**COUNT IV**

**UNJUST ENRICHMENT**
***(On behalf of Plaintiffs and the Class)***

301. Plaintiffs repeat the allegations contained in paragraphs 1-262 as if fully set forth herin and bring this Count individually and on behalf of the proposed Class.

302. Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

303. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

304. Defendant exceeded any authorization given and instead consciously disclosed, misappropriated, and misused the Private Information for marketing and its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary savings and revenue.

305. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members for the use of the Private Information.

306. The financial benefits that Defendant derived from Plaintiffs and Class Members were not offered by Plaintiffs and Class Members gratuitously and rightly belong to Plaintiffs and Class Members. It would be against equity and good

conscience for Defendant to be permitted to retain any of the savings, profit or other financial benefits wrongly derived from the misappropriation and misuse of Plaintiffs' and Class Members' Private Information as alleged in this Complaint.

307. Consequently, due to the unjust nature of Defendant's actions and the injuries and damages sustained by Plaintiffs and the Class, Defendant should be compelled to disgorge into a common fund all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper. These equitable funds can be evenly allocated among the Plaintiffs and Class Members on a pro-rata basis.

308. Alternatively, Defendant should be compelled to provide restitution to Plaintiffs and Class for the fair market value of the Private Information that Defendant misappropriated and misused for marketing purposes without consent.

309. Furthermore, Plaintiffs seeks injunctive relief to prevent the imminent financial and privacy harms arising from the ongoing disclosure, interception, and misuse of Plaintiffs' and Class Members' Private Information.

## COUNT V
## VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")

**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiffs and the Class)**

310. Plaintiffs repeat the allegations contained in paragraphs 1-262 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

311. The ECPA protects both sending and receipt of communications.

312. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

313. The transmissions of Plaintiffs' Private Information to Defendant via Defendant' Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

314. The transmissions of Plaintiffs' Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

315. **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

316. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

317. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

318. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's webservers; and

d. The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

319. By utilizing and embedding the Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

320. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to Facebook and Google.

321. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs' and Class Members' regarding PII and PHI, treatment, medication, appointments, and scheduling.

322. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

323. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

324. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, violation of the FCSA, invasion of privacy, among others.

325. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel and Conversions API to track and utilize Plaintiffs' and Class Members' Private Information for financial gain.

326. Defendant was not acting under color of law to intercept Plaintiffs and the Class Member's wire or electronic communication.

327. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Tracking Tools code.

328. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

329. In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious and designed to violate federal and state legal provisions, including as described above the following: (1) violating the FSCA; and (2) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

## <u>COUNT VI</u>
## BREACH OF CONFIDENCE
## (On behalf of Plaintiffs and the Class)

330. Plaintiffs repeat the allegations contained in paragraphs 1-262 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

331. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

332. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged via Defendant's Website.

333. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

334. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

335. The third-party recipients included, but may not be limited to, Facebook.

336. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

337. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private;

b. Plaintiffs and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

338. Defendant's actions violated the property rights Plaintiffs and Class members have in their Private Information.

## COUNT VII
## NEGLIGENCE
## (On behalf of Plaintiffs and Class Members)

339. Plaintiffs repeat the allegations contained in paragraphs 1-262 as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

340. Defendant owed Plaintiffs and Class Members a Duty to keep their private information completely, confidential and to safeguard sensitive personal and medical information.

341. Plaintiffs and class members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's website

342. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

343. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

344. The third-party recipients included, but may not be limited to, Meta and/or Google.

345. As direct and proximate cause of Defendant's unauthorized disclosure of patient, personally identifiable, non-public medical information, and communications. Plaintiffs and Class members were by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiffs and Class

members intended to remain private is no longer private;

b. Plaintiffs and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a Jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Private Information.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B. For an award of damages, including, but not limited to, past and future compensatory, actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

C. For equitable relief in the form of restitution and disgorgement of profits;

D. For injunctive relief requested by Plaintiffs, including, but not limited to:

i. Removal of the Tracking Tools from sensitive parts of the Website;

ii. Deletion of all analytics data collected through the Tracking Tools;

iii. Deletion of all audience profiles and campaigns built utilizing data gathered from the Tracking Tools;

iv. Deletion of Plaintiffs' and Class Member data from all identifiable third-party broker lists;

v. Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future.

vi. Enjoinment from utilizing any other Tracking Technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

vii. Other injunctive relief as ordered by the Court.

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

DATE: August 11, 2026

Respectfully Submitted,

*/s/ Tonyia Johnson*
Tonyia Johnson (Bar No. 1058251)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
E: tjohnson@shamisgentile.com

Mariya Weekes
**MILBERG PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel: 954-647-1866
E: mweekes@milberg.com

Joseph M. Lyon, *pro hac vice forthcoming*
**THE LYON FIRM**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
E: jlyon@thelyonfirm.com

***Counsel for Plaintiffs and the Putative Class***